# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

| | | |
|---|---|---|
| **JAMES P. LUNDSFORD, individually and on behalf of all others similarly situated,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | **No. 3:04-cv-442** |
| **v.** | ) ) | |
| **CALLAWAY GOLF COMPANY, a Delaware corporation and CALLAWAY GOLF SALES COMPANY, a California Corporation,** | ) ) ) ) ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

This putative class action arises out of claims of illegal restraint of trade and anti-competitive conduct by Callaway Golf Company and Callaway Golf Sales Company throughout the United States occurring since March 30, 2000. The plaintiff claims to have been injured in that they have paid more for Callaway golf clubs than they otherwise would have paid absent Callaway's allegedly unlawful conduct. The plaintiff seeks a determination that this action is a proper class action maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure, a declaration that the defendant's alleged conduct violated the Sherman Act, an order enjoining Callaway from the alleged illegal conduct in the future, and an award of legal costs and damages. The motions currently pending in this action are: (1) the plaintiff's motion for partial summary judgment as to liability under Section 1 of the Sherman Act, 15 U.S.C. § 1 [Court File

11], and (2) the plaintiff's motion for class certification [Court File 14]. For the reasons that follow, the motion for partial summary judgment is denied, and the motion for class certification is denied.

# I.

## *Factual Background*

The original complaint and amended complaint names James P. Lundsford, a resident of Jefferson County, Tennessee, as the sole putative class representative. During the putative Class Period, the plaintiff purchased Callaway golf clubs from Wynn's Sports World in Sevierville, Tennessee, a retail dealer in golf equipment and supplies.

Defendant Callaway Golf Company is a Delaware corporation transacting business across the United States, with its principal place of business in Carlsbad, California. Defendant Callaway Golf Sales Company is a California corporation transacting business across the United States. Callaway is the largest manufacturer of golf clubs in the United States, distributing them through retail dealers located throughout the country.

In 2000, Callaway implemented the New Product Introduction Policy ("NPIP"). The policy stated that Callaway would only supply retailers that sold directly to golfers, that did not discount the products, that did not engage in bait-and-switch selling, that did not disparage the Callaway Golf product, and that complied with all laws. This new policy was part of Callaway's conscious decision to do business with full-price retailers rather than discounters. Callaway also claimed that discounting and bait-and-switch tactics by some of its retailers caused the company to fear degradation of the Callaway

2

name brand. Among other things, the policy set a minimum price that retailers could sell Callaway products. Callaway claimed that the minimum price was set to allow for sufficient profit margins such that full-price retailers could provide fitting and training services to accompany Callaway products (e.g., 30-35% in the store where the representative plaintiff purchased clubs). Large, national retailers refuse to carry products that will not yield such profit margins.

The policy was developed with the close advice of legal counsel to adhere to antitrust laws. The NPIP states on its face that it is a "unilateral statement" and "not a contract, or an offer," further stating that Callaway "does not ask, and will not accept, any agreement about [a retailer's] compliance with this Policy." Callaway expressly forbade its sales force from discussing the policy with retailers, forcing any communications about the policy to go through their legal department.

Twenty NPIPs were issued between September 8, 1999 and August 30, 2004 to an estimated 17,000 retailers nationwide. These NPIPs were separated by more than six months only three times, while two or fewer months separated the issuances ten times. Each new NPIP superseded the previous one, allowing Callaway to add new products, carry over existing products, and remove products based on each product's life cycle. Each new NPIP described Callaway's requirement for retailers selling its golf clubs, including the minimum resale price for the product. The original NPIP dated September 8, 1999 included a signature line for acknowledging receipt of the policy and denying that the policy is an agreement, but Callaway abandoned that practice beginning with the NPIP dated October 18, 2000. Over 90% of Callaway's retailers received the NPIPs and had no other communication with Callaway about the policy.

Callaway attempted to enforce the policy, investigating each violation separately. Callaway's retailers generally fit into three categories: pro shops located on golf courses, stand-alone stores, and inside national sporting-goods stores. The NPIP was applied differently to different retailers. For example, in February 2001, Callaway excluded certain products sold in Tennessee by Dick's Sporting Goods. Similarly, "Mill River" plans sold at pro shops were originally not subject to the NPIP. They were included for a short time, and then excluded again. Callaway also treated violators of the policy differently. Some were sent letters stating that Callaway was aware of the violation and would refuse to accept new orders if the retailer continued to act contrary to the NPIP. Some had their shipments of the specific inventory item suspended for an indefinite amount of time, although Callaway would continue to accept orders for all other products carried by the retailer. The period of time in which Callaway would refuse to accept new orders varied by customer and product, and also changed from year to year. For example, the store that the representative plaintiff bought clubs from claims to not have been able to order a particular club for six months, while another store was allowed to purchase the same club again in an identical situation after only three months. Sometimes, Callaway elected not to enforce the NPIP at all, such as when retailers discounted products that were about to be taken off the NPIP.

Wynn's Sports World ("Wynn's") in Sevierville, Tennessee, was a retailer for Callaway. Mike Coughlin, the president of Wynn's, signed an NPIP covering certain Callaway products in January 2000. James D. Bowles, the director of golf operations at Wynn's, claims to have signed another NPIP the following year in 2001, but the last NPIP issued with a line for signature had an effective date of January 20, 2000. The first

4

NPIP issued for the 2001 year had an effective date of May 1, 2001. In the summer of 2001, Callaway sent a letter to Wynn's advising them that they suspected Wynn's was selling Callaway's "Big Bertha Steelhead Plus Metal Woods" below the minimum price listed in the NPIP. When Wynn's did not stop selling the Callaway clubs below the agreed price, Callaway refused to accept any more orders from them for that item. During the 2001 PGA show in Orlando Florida, Mike Coughlin and Robert Jones, the vice president of retail operations at Wynn's, met with Michael Rider, legal representative for Callaway, to discuss the problems. This meeting did not produce any results. The plaintiff claims that Wynn's was not able to purchase the item until it was no longer subject to the NPIP. However, the NPIP issued with an effective date of May 2, 2001 stated that the clubs in question were no longer "covered by the 2001 New Product Introduction Policy" (as did the subsequent NPIP with an effective date of August 24, 2001).

In November 2000, the plaintiff James P. Lundsford purchased a set of "Big Bertha Hawk Eye Irons" from Wynn's. He paid the minimum price of $1249 as listed in the NPIP with the effective date of October 18, 2000. A few weeks later, the plaintiff also purchased from Wynn's a "Great Big Bertha Hawk Eye Driver" for $459. This product does not appear in the NPIP effective at that time. There is no evidence to indicate that he retained his receipt or paid the NPIP price. Jerry Messer was the salesman for Wynn's at the time, who later gave a copy of the NPIP to the plaintiff. At the time of the purchase, Callaway had not discussed the NPIP with Wynn's.

## II.

### *Procedural History*

In 2001, the plaintiff filed an original class action in Tennessee state court regarding Tennessee and Kansas law. The plaintiff also filed an identical class action in Kansas, which was later stayed. Rule 23.03 of the Tennessee Rules of Civil Procedure states that class certification should be decided "[a]s soon as practicable after the commencement of an action brought as a class action." Three years later, the defendant filed a motion that the class should not be certified. The day before the hearing on that motion, the plaintiff filed this action. The Tennessee state court action has still not been certified.

In the complaint, the plaintiff alleged three causes of action.

Count I alleged a cause of action for illegal restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. This Count was the subject of the plaintiff's motion for partial summary judgment. [Court File 11]. The plaintiff subsequently filed two affidavits supporting the motion. On March 30, 2005, the defendant filed a response in opposition of the motion, subsequently filing deposition excerpts in support of the opposition. On April 7, the plaintiff filed a motion for leave to file a consolidated memorandum, in part replying to the defendant's opposition to the motion.

Count II was dismissed.

Count III alleged causes of action for violations of the antitrust laws of Tennessee, Kansas, South Carolina, and Oklahoma under the court's supplemental

jurisdiction. However, the plaintiff now attempts to drop this Count III altogether in the proposed amended complaint. Defendant opposes this amendment.

## VI.

### *Motion for Partial Summary Judgment for violation of Sherman Act § 1*

The plaintiff claims that summary judgment is proper in this case because "the undisputed facts show that Callaway and participating retail dealers have engaged in a contract, combination or conspiracy to fix prices on Callaway products, creating a *per se* violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and the antitrust statutes of Tennessee, Kansas, South Carolina and Oklahoma."

### *a.*

### *Standard of Review for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be rendered when requested if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. It is the burden of the party seeking summary judgment to show the court that, under uncontradicted facts, the moving party is entitled to judgment as a mater of law. Summary judgment is intended to provide a quick, inexpensive means of resolving issues as to which there is no dispute regarding material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). In assessing the validity of a summary judgment motion, the court views the pleadings, depositions, answers to interrogatories, admissions, and competent

affidavits in the light most favorable to the opponent of the motion.  However, the party opposing the motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but must set forth through competent and material evidence, specific facts showing that there is a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Id*.  Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an essential element of that party's case, and on which the party will bear the burden of proof at trial.  *Catrett*, 477 U.S. at 322.

### b.

### *Federal Antitrust Claims*

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C.A. § 1.  Although this section describes criminal penalties, the Clayton Act states that, "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."  15 U.S.C.A. § 15 (formerly Clayton Act § 4).

In *United States v. Colgate & Co.*, the Supreme Court held that a manufacturer has a near absolute right to select with whom it will deal, and to announce in advance the terms and conditions upon which it will do business. 250 U.S. 300, 307 (1919). A manufacturer could announce that it would sell only to dealers charging a predetermined resale price, and could terminate sales to any dealer which did not comply. *Id.* Later in *Monsanto Co. v. Spray-Rite Service Corp.*, the Court upheld minimum prices set by manufacturers because "[t]he manufacturer often will want to ensure that its distributors earn sufficient profit to pay for programs such as hiring and training additional salesmen or demonstrating the technical features of the product, and will want to see that 'free-riders' do not interfere." 465 U.S. 752, 762-63 (1984). No antitrust violation arises from a manufacturer's merely adopting a resale price policy and a retailer's following the policy to avoid termination of sales to the account. Under such antitrust laws, the retailer/distributor is "free to acquiesce in the manufacturer's demand in order to avoid termination." *Id.* Moreover, a plaintiff claiming resale-price agreement must show "both that the distributor communicated its acquiescence or agreement, and that this was sought by the manufacturer." *Id.* at 764 n.9. Unless the manufacturer seeks such a communication from the retailer/distributor and receives it, there is no "agreement." *Id.* Further, in *Business Electronics Corp. v. Sharp Electronics Corp.*, the Court held that there must be an "agreement on the price or price levels to be charged by the remaining dealer" as well as an agreement between the manufacturer and a dealer to terminate a 'price cutter.'" 485 U.S. 717, 726 (1988).

The plaintiff suggests that, under *United States v. Colgate & Co.*, 250 U.S. 300 (1919), a manufacturer can suggest prices but has only one choice with respect to

violators – immediate termination of product purchasing privileges with no warning, no second chances, and no continued shipments in response to assurances of future compliance. The plaintiff maintains that Callaway never intended that termination of a dealer was an option under the NPIP. However, Callaway *did* terminate the ability of Wynn's (the plaintiff's sole example) to purchase the golf clubs that were subject to the NPIP. Callaway only allowed Wynn's to again order the clubs once they were no longer subject to the NPIP.

Plaintiff further asserts that Callaway's conduct constitutes a "per se violation" of state and federal antitrust laws. "Per se rules of illegality are appropriate only when they relate to conduct that is manifestly anticompetitive." *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 50 (1977). The allegedly illegal practices, "because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pac. R. Co. v. United States*, 356 U.S. 1, 5 (1958). Thus, the plaintiff is asking the court to find that Callaway's sales policy generally harms society, devoid of any accompanying benefit, without a substantial inquiry into the circumstances.

The court finds that this is not a per se violation of antitrust laws. The defendant has presented a plausible argument that the policy may be beneficial to the company, its suppliers, and the golf industry as a whole. The resale price policy, *inter alia*, protects reseller margins so that services such as fitting and testing can be provided, supports a premium brand image, facilitates investment into research and product development, and provides stability to combat destructive competition between retailers.

10

The plaintiff cites *Bender v. Southland Corp.* for the proposition that the "Supreme Court has long held that vertical price fixing is a per se violation of § 1 of the Sherman Act." 749 F.2d 1205, 1211-12 (6th Cir. 1984). However, the court in that case maintained that the "practice is unlawful because it restricts the freedom of traders who are at lower levels of the product or service distribution system to set their own prices." *Id.* (citing *Kiefer-Stewart*, 340 U.S. 211 (1951); *AAA Liquors, Inc. v. Joseph E. Seagram & Sons, Inc.*, 705 F.2d 1203 (10th Cir. 1982)). The instant case is distinguishable because there are no lower levels in the distribution system. Callaway sells only to retailers who deal directly with consumers.

In adopting that policy with the assistance of experienced antitrust counsel, Callaway followed well-established antitrust law that allows a manufacturer to choose its retail customers – including those retailers who do not discount. Before implementing the policy, Callaway sought expert legal advice, devising both an unambiguous document and a vigilant method of executing the policy. In fact, Callaway appears to have made more than reasonable efforts to implement its NPIP as an independent action, not subject to negotiation or agreement with any of its retailers. Wynn's had the choice to discontinue business with Callaway, but they voluntarily chose to acquiesce to Callaway's sales policy requirements. There is no evidence to show that Callaway sought any sort of agreement from Wynn's to abide by its sales policy. Thus, the plaintiff has failed to show that he is entitled to judgment as a matter of law. In fact, the facts are uncontradicted at this point that the plaintiff has failed to come forward with evidence that at least two elements of a per se claim have been met, specifically (1) the

existence of an agreement, and (2) harm to society with a lack of any accompanying benefit.

### c.

### *State Antitrust Claims*

The plaintiffs also maintain state law claims in their complaint. The relevant Tennessee law states that:

> All arrangements, contracts, agreements, trusts, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in the importation or sale of articles imported into this state, or in the manufacture or sale of articles of domestic growth or of domestic raw material, and all arrangements, contracts, agreements, trusts, or combinations between persons or corporations designed, or which tend, to advance, reduce, or control the price or the cost to the producer or the consumer of any such product or article, are declared to be against public policy, unlawful, and void. TENN. CODE ANN. § 47-25-101 (1995). Any person who may be injured or damaged by any such arrangement, contract, agreement, trust, or combination described in this part may sue for and recover, in any court of competent jurisdiction, from any person operating such trust or combination, the full consideration or sum paid by the person for any goods, wares, merchandise, or articles, the sale of which is controlled by such combination or trust. TENN. CODE ANN. § 47-25-106 (1995).

The law was passed by Tennessee in 1891 to supplement the federal antitrust laws. *See Standard Oil Co. v. State*, 100 S.W. 705, 710 (Tenn. 1907) ("The wrongs to trade which were intended to be corrected and punished were those being perpetrated against commerce within the state, which Congress could not reach, and for which there was then no efficient remedy."). Thus, Tennessee courts have held that state antitrust laws are consistent with the federal law in that they focus on the same illegal conduct. *Jo Ann Forman, Inc. v. Nat'l Council on Comp. Ins., Inc.*, 13 S.W.3d 365, 368 (Tenn. Ct.

App. 1999) ("The Legislature clearly intended to prohibit trusts, combinations, and agreements affecting all commerce not covered by the federal statute, and upon which it had a right to legislate.").

For the reasons stated above for the federal antitrust claims, the plaintiff has failed to show that he is entitled to judgment as a matter of law.

Plaintiff has filed a motion to amend his complaint to drop his state law antitrust claims [Court File #54]. Defendant objects contending that the only purpose for dropping the state law claims at this point would be to allow the plaintiff to rebring the same lawsuit in state court should this court deny class certification. The court agrees with the defendant and finds that plaintiff has failed to show good cause for the amendment. Accordingly, the motion to amend [Court File #54] will be denied.

## VIII.

### *Class Certification*

The complaint defines the class as follows:

> All persons who purchased Callaway golf clubs from dealers and co-conspirators in the United States that were subject to Callaway's and the dealers' agreements setting minimum prices from March 20, 2000 until the trial of this action is concluded. Excluded from the Class are all directors, officers, agents, and/or employees of Callaway.

Before a class may be certified under Rule 23, the party seeking class certification must establish that the class satisfies all four prerequisites of Rule 23(a). *In re American Medical Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996). Pursuant to Rule 23(a), the burden is on the party seeking class certification to prove that: (1) the class is so numerous that

13

joinder of all members is impractical; (2) there are questions of law or fact common to the class; (3) the claims of the representative plaintiffs are typical of the claims of the class; and (4) the named plaintiffs and class counsel are adequate representatives for the class. FED. R. CIV. P. 23(a). In addition, the party seeking class certification must also establish that the proposed class action qualifies for class treatment under one or more of the Rule 23(b) subcategories. FED. R. CIV. P. 23(b).

Subtle differences distinguish some of these categories. For instance, there is an "extensive" overlap between Rule 23(a)(3) and (a)(4). 1 NEWBERG ON CLASS ACTIONS § 3:22, at 411. However, satisfaction of the typicality test "does not automatically mean that adequacy of representation is present." *Id.*, at 412. Additionally, "[t]here is considerable overlap between Rule 23(a)(2) and (b)(3)." 2 NEWBERG ON CLASS ACTIONS § 4:22, at 152. "The Rule 23(a)(2) prerequisite requires that common questions exist. Rule 23(b)(2) requires that they predominate." *Id.* Each will be addressed below.

### a.

### Rule 23(a)(1) Numerosity

Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impractical." FED. R. CIV. P. 23(a)(1). In this case, numerosity is not in dispute.

### b.

### *Rule 23(a)(2) Commonality*

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2). One issue that is common to all class members is sufficient. *In re Cardizem*, 200 F.R.D. 326, 335 (E.D. Mich. 2001).

The defendant notes the vast number agreements comprised of various types of relationships and varying interactions between Callaway and its retailers. However, this argument is better suited for the higher threshold set for predominance in Rule 23(b)(3), which is "an important check on this requirement." *In re American Medical Sys., Inc.*, 75 F.3d 1069, 1080 (6th Cir. 1996).

The plaintiff satisfies the commonality requirement because there are common questions of law and fact. Callaway's liability to individual purchasers depends upon the determination of the same issue of law, namely whether Callaway violated Section 1 of the Sherman Act. As for common questions of fact, the plaintiff offers the following examples: whether Callaway possesses market power in the golf club market; whether Callaway used its market power … to raise the prices of its golf clubs; whether competition in the golf club market and among Callaway's retailers was adversely affected; whether the members of the class suffered injury as a result.

It is worth noting that the defendant suggests the purchased golf clubs were not subject to the NPIP. If this is true, the plaintiff would not have a common question of fact with the putative class members, failing the commonality requirement. However, that question cannot be resolved at this point.

*c.*

*Rule 23(a)(3) Typicality*

Rule 23(a)(3) requires that "the claims of the representative plaintiffs are typical of the claims of the class." FED. R. CIV. P. 23(a)(3). "Typical claims arise from the same event or course of conduct giving rise to the claims of other class members and is based on the same legal theory." [Court File 15] (citing *Senter v. General Motors Corp.*, 532 F.2d 511, 525 (6th Cir. 1976), *cert. denied*, 429 U.S. 870 (1976)). Claims may satisfy this requirement, "'even if members purchase different quantities and pay different prices.'" *In re Cardizem*, 200 F.R.D. 326, 335-36 (E.D. Mich. 2001) (quoting *In re Playmobil Antitrust Litig.*, 35 F.Supp.2d 231, 242 (E.D.N.Y. 1998))."

The defendant alleges that the plaintiff does not meet the typicality requirement because his case is "[]encumbered by the presence of active participation by plaintiff's counsel," referencing the relationship between the plaintiff and counsel. However, the plaintiff satisfies the typicality requirement because the claims of the representative plaintiff are typical of the claims of the class. The sole putative class representative is James P. Lundsford. The plaintiff purchased a Callaway golf club during the class period from Wynn's Sports World, who was allegedly "subject to Callaway's and the dealers' agreements setting minimum prices." Claims brought by other members of the putative class would be substantially similar to the representative plaintiff.

The court again notes that the defendant suggests the purchased golf clubs were not subject to the NPIP. If this is true, the plaintiff would not have a claim typical of the putative class members, failing the typicality requirement. Again, however, that question cannot be resolved at this point.

### d.

### *Rule 23(a)(4) Adequacy*

Rule 23(a)(4) requires that "the named plaintiffs and class counsel are adequate representatives for the class." FED. R. CIV. P. 23(a)(4). The plaintiff offers [Court File 15] two elements for this test: (1) the representative must have common interests with the unnamed class members, and (2) it must appear that the representative will vigorously prosecute the class action through qualified counsel. *Senter v. General Motors Corp.*, 532 F.2d 511, 525 (6th Cir. 1976), *cert. denied*, 429 U.S. 870 (1976).

The plaintiff claims to meet the adequacy requirement because (1) "the named representative and the class members … were similarly injured by the same illegal conduct," and (2) the plaintiff's counsel are qualified and experience lawyers. [Court File 15]. Indeed, there appears to be no conflict between the representative plaintiff and the class members, and the qualifications of plaintiff's counsel are clearly sufficient. However, the plaintiff's failure to move to certify the class during the past three years is a "strong indication" that the plaintiff is not adequately representing the putative class. *East Tex. Motor Freight Sys. v. Rodriguez*, 431 U.S. 395, 404-405 (1977) (citing *Beasley v. Kroehler Mfg. Co.*, 406 F.Supp. 926, 931 (D.C.Tex. 1976) ("The Court concludes that the plaintiff may not maintain her suit as a class action due to her failure to pursue class representation diligently through the filing of a motion to certify her suit as a class action.")); *see also McGowan v. Faulkner Concrete Pipe Co.*, 659 F.2d 554, 559 (5th Cir. 1981) ("the district judge might properly take into consideration the circumstance that the plaintiffs' counsel did not move for certification during the two years the suit was pending."). Here, I also conclude that the adequacy requirement has not been met

because the plaintiff has failed to demonstrate that he will vigorously prosecute the class action through qualified counsel.

*e.*

### *Rule 23(b)(2) Injunctive Relief*

Rule 23(b)(2) applies when "the party opposing the class has acted … on grounds generally applicable to the class, thereby making appropriate injunctive relief … with respect to the class as a whole." FED. R. CIV. P. 23(b)(2).  The plaintiff maintains that the elements to this rule are that:  (1) the claims of the class are cohesive, and (2) the relief sought is equitable in nature.

The plaintiff claims to meet the injunctive relief requirement because (1) the claims of the putative class are cohesive because they all share "a common characteristic subjected to [actions by the defendant]." *Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, *250 (C.A.Pa. 1975).  Also, (2) the plaintiff has asked for injunctive relief in their complaint.  However, class certification under Rule 23(b)(2) is appropriate only "so long as the predominant relief sought is injunctive or declaratory."  *Ford v. Nylcare Health Plans of Gulf Coast, Inc.*, 190 F.R.D. 422, 428 (S.D.Tex.,1999) (quoting *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 411 (5th Cir.1998)).  "[O]ne critical factor is whether the compensatory relief requested requires individualized damages determination or is susceptible to calculation on a classwide basis."  *Coleman v. GMAC*, 296 F.3d 443, 448 (6th Cir., 2002).  Because any damages assessed will have to be determined for every retailer of Callaway products due to factors such as market prices, damages are not "susceptible" to a classwide calculation.  *Id.*  Further, it is reasonable to assume that the

primary relief sought in this case is monetary damages and attorney fees, based on the history of the case, conduct of the parties, and the nominal attention paid to injunctive relief by the plaintiff in the complaint and supporting briefs.

The plaintiff cites *Olden v. Lafarge Corp.* for the proposition that any class seeking injunctive relief should be certified under Rule 23(b)(2).  383 F.3d 495, 510 (6th Cir. 2004).  However, the court in that case emphasized the "importance of the injunctive relief" itself.  Indeed, the plaintiffs in that case were homeowners that were having their health and homes damaged by a large cement manufacturer emitting hazardous toxic waste in violation of a consent decree.  Moreover, there is virtually nothing in the record in this case to indicate that the predominant relief sought is injunctive.

### *f.*

### *Rule 23(b)(3) Predominance and Superiority*

To be certified as a class under Rule 23(b)(3), "questions of law or fact common to the members of the class [must] predominate over any questions affecting only individual members, and [the class action must be] superior to other available methods for the fair and efficient adjudication of the controversy.  The matters pertinent to the findings include: …  (D) the difficulties likely to be encountered in the management of a class action."  FED. R. CIV. P. 23(b)(3).

The plaintiff claims to meet the predominance and superiority requirement because the fact of injury and damages can be demonstrated with "common proof." According to the plaintiff, this case would establish the fact of injury for the entire class. As long as the injury was common to all class members, the variability of the damages

from member to member does not matter. However, this argument is contrary to precedent in this circuit. In *Mekani v. Miller Brewing Co.*, the court addressed a similar argument in which the plaintiff alleged a beer manufacturer and its distributors were engaged in illegal price fixing. 93 F.R.D. 506, 510 (D.C.Mich., 1982). The court held that:

> The plaintiffs in the instant case have not satisfactorily demonstrated any method by which the distributors' participation in the conspiracy can be proved through any common set of facts. Plaintiffs' argument that there are common issues because there is only one conspiracy does not address the real issue. The complaint specifically alleges that the brewers, by agreement or coercion, imposed their plan on the distributors. Thus, the plaintiffs will necessarily have to show some sort of agreement or coercion between the brewers and each of the 180 distributors. Defendants contend, and the Court agrees, that the very process of proving the existence of the vertical arm of the conspiracy will raise questions which would require individual treatment. The case would degenerate into 180 separate trials and common questions would be overwhelmed by issues peculiar to individual parties. The plaintiffs' bald allegation that a conspiracy existed in violation of the antitrust laws does not insure that common questions will predominate.

*Id.* Further, the 6th Circuit has held that the refusal to certify a class on this basis is not an abuse of discretion. *Stout v. J.D. Byrider*, 228 F.3d 709, 718 (6th Cir. 2000) (holding that the plaintiff did not meet the requirement of Rule 23(b) when any resolution of claims other than the representative plaintiff would be subject to an "individual assessment").

The putative class cannot be properly certified under Rule 23(b)(3) because the plaintiff has failed to show that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members." FED. R. CIV. P. 23(b)(3). Litigating the issue of whether Callaway's sales policy could be found to be an agreement with the nearly 17,000 other Callaway golf locations would devolve into an unmanageable tangle of fact-specific mini-trials. Individual issues that would have to be

resolved for each class member would include whether there was an agreement, the scope of the agreement, the timeframe of the agreement, whether a class member was actually injured, and what the extent of the damages were.

"The central issue in each class member's case would be whether [a particular] retailer's decision to sell at the NPIP price or not in that specific transaction was the product of an 'agreement' with Callaway Golf."  The effort and expense of both parties to determine the issues for just one such store should be noted, including the numerous affidavits, depositions, subpoenas, and expert witnesses.  There is no reason to believe that any class member would face any easier or shorter task.  During the class period Callaway distributed products through shops at golf courses, stand-alone stores, and inside national sporting-goods stores.  Even the plaintiff admits that Callaway made individual decisions and took varying actions against different retailers.  The NPIP was not consistently and continually applied and Callaway considered other factors before choosing to pursue any particular retailer.

Even if the fact of an agreement was established, individual class members would have to litigate the scope and timeframe of the alleged agreement.  The court would have to determine which products were subject to the agreement.  This issue has already come up in the instant case, where the defendant contends the plaintiff did not purchase clubs subject to the NPIP.

The timing of the alleged agreement is an even more elusive issue.  The period of "probation" given to violators of the policy varied in each circumstance.  Callaway's decision would vary "product by product, and it would depend customer by customer, and it would depend on what time period … ."  [Rider Deposition at 160].  Callaway

would not tell the retailer, and the retailer would not know how long they would be unable to purchase the product. [Rider Deposition at 76]. The NPIPs do not include specific dates, only the item that it purports to cover. Callaway's variable treatment of individual retailers suggests that the length of time the policy remained in effect differed from retailer to retailer. Further, the plaintiff does not dispute that approximately 50% of products covered by the policy are discounted. Thus, the issue of whether the alleged agreement could be negated by the actions of the retailer's themselves would have to be addressed in many of the cases.

Additionally, any formula offered by the plaintiff could not calculate damages for the entire class. The issue of damages would have to be resolved with each individual retailer. First, the markets will fluctuate widely based on geographic location. No comparison of prices that would have been charged without the alleged illegal conduct could be made without litigating this issue. Second, the sales policy did not affect the actions of many retailers. For instance, many retailers sold Callaway products at more than the minimum price. Also, many retailers willingly sold Callaway products at the suggested minimum price for other reasons, including the fact that the suggested price built in a substantial profit margin. Further, when consumers purchase golf equipment, they often receive discounts, store credit, or additional free items such as golf balls. The damages calculation would have to include any of the various means of affecting the actual price of the equipment.

Finally, it would be difficult at best for individual consumers to determine whether they were entitled to membership in the class. Individual consumers would have no reason to know about potential litigation connected with their purchase of Callaway

products. Even if notice was sufficient to alert every person who purchased a Callaway product within the time period, there would be tremendous difficulty in determining which consumers had legitimate claims. Only the most diligent consumers keep receipts for recreational supplies such as golf clubs for any appreciable amount of time. The fact of purchase would then become a matter for the jury. *Johnston v. HBO Film Management, Inc.,* 265 F.3d 178, 190 (3rd Cir. 2001) ("In cases raising issues similar to those here, it has become well-settled that, as a general rule, an action based substantially on oral rather than written communications is inappropriate for treatment as a class action."). The complaint also fails to address consumers who may have resold their clubs.

## IX.

### *Conclusion*

For the foregoing reasons, the motion for partial summary judgment [Court File #11] is DENIED and the motion for class certification [Court File #14] is DENIED. The plaintiff has not sustained the burden of proving that summary judgment is due under Rule 56 or that this case should be certified as a class action under Rule 23 of the Federal Rules of Civil Procedure. Plaintiff's motion to amend his complaint [Court File #54] is DENIED.

Order accordingly.

_____*s/ James H. Jarvis*_____
UNITED STATES DISTRICT JUDGE